COLES v. COLLECTOR OF CUSTOMS FOR PORT OF SAN FRANCISCO.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1900.)

No. 560.

CUSTOMS DUTIES—CLASSIFICATION—ANTHRACITE COAL.

Anthracite coal, containing less than 92 per centum of fixed carbon, is within the provision of paragraph 415 of the tariff act of 1897, which imposes a duty on "coal, bituminous, and all coals containing less than 92 per centum of fixed carbon," and is not entitled to free entry under paragraph 523, in the free list, which includes "coal, anthracite, not specially provided for in this act."

Appeal from the Circuit Court of the United States for the Northern District of California.

Sidney V. Smith, for appellant.

Marshall B. Woodworth, Asst. U. S. Atty. (Frank L. Coombs, U. S. Atty., of counsel), for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is an appeal from the judgment of the circuit court (93 Fed. 954) sustaining the decision of the board of United States general appraisers that a cargo of anthracite coal imported from Wales into the port of San Francisco, Cal., which contained "less than ninety-two per centum of fixed carbon," was subject to duty at the rate of 67 cents per ton, as provided by paragraph 415 of the act of July 24, 1897, entitled "An act to provide revenue for the government, and to encourage the industries of the United States" (30 Stat. 151–190), commonly known as the "Dingley Tariff Act." The contention of the appellant is that the decision of the appraisers, and the judgment of the circuit court affirming it, are erroneous, in this: that anthracite coal is to be admitted free under paragraph 523 (30 Stat. 197). It is admitted that the coal in question is anthracite, and contains less than 92 per cent. fixed carbon. The respective paragraphs read as follows:

"(415) Coal, bituminous, and all coals containing less than ninety-two per centum of fixed carbon, and shale, sixty-seven cents per ton of twenty-eight bushels, eighty pounds to the bushel." "(523) Coal, anthracite, not specially provided for in this act."

The ordinary and plain meaning of these paragraphs would seem to leave no doubt as to their proper construction. Read in pari materia, they are susceptible of but one meaning. Paragraph 415 provides a duty for all coals containing less than 92 per cent. fixed carbon. There is no exception stated, and no reference made to other provisions of the act. There is no ambiguity or uncertainty in the language used. Paragraph 523: "Coal, anthracite, not specially provided for in this act," is placed on the free list. But, turning back to paragraph 415, it will be seen that all coal (which includes anthracite) that contains "less than ninety-two per centum

of fixed carbon" is "specially provided for in this act"; and this paragraph therefore only applies to coal, anthracite, which contains 92 per centum or more of fixed carbon. There is no conflict between the two paragraphs. No words have to be interjected into either to make them clear, plain, and consistent with each other. It is a cardinal rule of construction that, if the language used is so clear as to admit of but one meaning, there is no room for any other construction. It is never allowable to interpret a paragraph or section which has no need of interpretation. To undertake a departure from the language used would in fact be an unjustifiable assumption by the court of legislative power. It is the duty of the court, where the language is free from doubt or uncertainty, to confine itself to the words of the legislative body that enacted the law, without adding anything thereto or subtracting anything therefrom. These general principles are too well settled to require any reference to the numerous authorities upon this subject. If applicable to the present case, it necessarily follows that the judgment of the circuit court was correct. But the learned counsel for appellant has ingeniously and ably attacked this position, and, in apparent candor and with great earnestness, contends that the respective paragraphs are clearly susceptible of another meaning, and that it is apparent that the conclusions reached by the court are manifestly unsound and erroneous, and contrary to the plain intent of congress in passing the act in question. It would, indeed, be difficult for the legislative body to so frame a tariff act as to prevent any controversy as to its meaning upon the part of opposing counsel. It is always easy to "pick flaws" and "catch at straws," and make suggestions that, if the statute meant what is claimed for it by the opposing side, it is reasonable to believe that different language would have been used. In re Wise (C. C.) 93 Fed. 443, 445. It is sometimes difficult to answer these suggestions. The fact is that it is often unnecessary to do so, because the duty of courts, in the interpretation of statutes, is often fully accomplished by bringing sense out of the words used in the statute, without attempting to use other words to bring sense into it. In all cases where there is any ambiguity, doubt, or uncertainty, or where it is evident that the literal meaning of the words used would be inconsistent with or directly opposite to the policy, object, and purpose which the framers of the statute had in view in enacting it, great latitude is allowed in their interpretation. The rule is universal that in the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms, and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt and the remedy in view; and the intention is to be taken or presumed according to what is consonant with sound reason and judicial discretion. But courts are not authorized to imagine an intent contrary to the ordinary meaning of the words used, and then seek to bind the letter of the act to that intent by arbitrarily striking out, inserting, or remodeling

the language of the act for the purpose of making it express such intent.

The customs duties imposed by the tariff acts are varied and extensive. They necessarily cover a great variety of articles classified under different heads. It often happens that in certain paragraphs there are certain mixed articles named, descriptive in their general character, and in other parts of the act there are other paragraphs, containing other descriptions, which might, if they stood alone, be sufficient to cover the same articles that are in the other paragraphs either generally or specifically described. In the light afforded by this condition of affairs, appellant argues that the words "containing less than ninety-two per centum of fixed carbon," in paragraph 415, are not a specific description of any kind of coal, and cites authorities to the effect that when an article is designated by a specific name, and a duty imposed upon it by such name, general terms in another part of the act, although sufficiently broad to comprehend such article, are not applicable to it, and contends that, inasmuch as anthracite coal is specifically designated by name in paragraph 523, it should be admitted free of duty, without regard to the question whether it contains more or less than 92 per centum of fixed carbon, and that paragraph 415 should therefore be read, "All coals containing less than ninety-two per centum of fixed carbon except anthracite coal must pay duty." This position would be materially strengthened if the facts were as counsel asserts, that "anthracite is specifically designated, without qualification, in the free list." But the fact is that it is not so designated. Anthracite coal is, it is true, specifically named; but it is to be admitted free, subject to the qualifying clause, "not specially provided for in this act." This materially changes the meaning that might otherwise be attributed to it if this qualification had not been added. Appellant, however, argues that the added words do not modify the word "anthracite," and that there are no other provisions in the act specially providing for "anthracite" by name. It is not denied that anthracite is coal, and that the words "all coal" in paragraph 415 would, if standing alone, without reference to paragraph 523, include anthracite coal; but this is met by the statement of appellant that, in order to make the respective paragraphs harmonize from his standpoint, the words "except anthracite" must be injected into paragraph 415. But, if the court cannot see its way clear to amend that paragraph as suggested, counsel claims that the words in paragraph 523, "not specially provided for in this act," should be either omitted from the act, or entirely disregarded by the court, in order that that paragraph might fully harmonize with paragraph 415 as amended in the manner contended for by him. We are asked to disregard these words because it may be that they were simply thrown in, as was said by the supreme court in Smythe v. Fiske, 23 Wall. 381, 23 L. Ed. 49, "out of abundant caution," and that there was nothing for the phrase to operate on, because anthracite coal was not specifically mentioned or provided for by any other paragraph or section of the act. If "all coal" were not comprehensive enough to include anthracite as well as any other kind of coal, whether specifically named

or not, appellant's position might be sustained;. but we are unwilling to give such a construction to the act, because it would necessarily imply that congress did not understand the plain meaning of the words "all coal," contained in the paragraph in question. The words "out of abundant caution," as used in Smythe v. Fiske, do not imply that the sentence "not otherwise provided for" should be discarded in the interpretation of the different paragraphs or sections of the act; but, on the contrary, the opinion of the court clearly shows that the sentence must be given effect, and that its meaning should be interpreted in accordance with the legislative intent. The opinion, in so far as it is applicable to this case, tends strongly to support the views we have expressed. There the question under consideration was whether the duty on silk neckties was to be governed by the eighth section of the supplemental act of June 30, 1864, or by the provisions of the acts of 1861 and 1862. The last clause of the eighth section of the act of 1864 reads as follows: "On all manufactures of silk or of which silk is the component material of chief value, not otherwise provided for." The circuit judge held that silk neckties came within the last clause of the eighth section of the act of June 30, 1864, unless the words "not otherwise provided for" excluded them from it, and brought them within the acts of 1861 and 1862, which provided for a less duty, and instructed the jury that this phrase referred, not to the preceding part of the eighth section of 1864, but to the prior acts of 1861 and 1862. The supreme court said:

"We agree with him as to the comprehensive character of the previous part of the sentence, if unqualified, but we dissent from his second proposition. To the latter we think there is a conclusive answer. The object of the statute was to increase the duties before imposed upon the things which it embraces. The title and the context alike show this. The preceding part of the section contains a very full enumeration of articles of silk, both manufactured and unmanufactured. It was evidently intended to be exhaustive. The last clause seems to have been added, as it is not unusual in such cases, out of abundant caution, that nothing might escape. Hence the phrase 'not otherwise provided for' was interposed, and meant to apply, not to preceding acts which may not have been present to the mind of the draftsman, and to which there was no necessity to recur, but to the preceding enumeration in the same section, which it supplemented. The section, thus construing this clause, covers the whole subject of silk, in all its variety of forms. It was complete in itself. There was no need to refer generally or specially to any prior act."

See, also, Movius v. Arthur, 95 U. S. 144, 147, 24 L. Ed. 420; Solomon v. Arthur; 102 U. S. 208, 212, 26 L. Ed. 147.

The clause in question is made in the present case absolutely clear by adding, perhaps out of abundant caution, the words "in this act," so that no contention could possibly be made that it applied to any other act.

There is another canon of construction, which, if strictly observed, leads with unerring certainty to the conclusion that the paragraphs in question mean just what the language thereof naturally imports. "The intention of the lawmakers is the law." There are different methods of arriving at this intention. A comparison of former legislation upon the same subject may be made for the purpose of ascertaining whether the general object and purposes of

previous tariff legislation have been departed from or adhered to, and the views expressed by the members of congress may be examined for the purpose of shedding light upon the question, if it is involved in any substantial doubt. The circuit court, in Re Coles, 93 Fed. 954, 956, reviewed at length the statutes relative to duty on coal from 1789 up to the passage of the Dingley act of July 24, 1897. Reference to this opinion shows that previous to the act of July 14, 1870 (16 Stat. 256, 266), which was an act to reduce internal taxes and for other purposes, "coal, anthracite," had never been specifically mentioned in any tariff act. For over 80 years it had been subject to duty as other coal. By the act of 1870, "coal, anthracite," was placed on the free list; and with the exception of the act of June 6, 1872 (17 Stat. 230), where no mention is made of anthracite, it appears in the various subsequent acts on the free list, as "coal, anthracite." It had been on the free list for over 20 years prior to the passage of the Dingley act, under consideration. It thus affirmatively appears that the language used in paragraph 415 of the act in question is, as stated by the circuit court, "a departure from that of all previous sections of the law upon this subject, and distinctly provides that all coals containing less than ninety-two per centum of fixed carbon  *  *  *  should be subject to a duty of sixty-seven cents per ton." The same view was taken by the general appraisers:

"If the framers of the present act had not intended any change with respect to coals, other than in the dutiable rate, they would doubtless have adopted the descriptive language of the previous acts, in accordance with the long-established usage. In other words, if no change was intended, why add, in paragraph 415, the radically different language, 'and all coals containing less than ninety-two per centum of fixed carbon,' and in paragraph 523 the important qualifying words, 'not specially provided for in this act'? Greenleaf v. Goodrich, 101 U. S. 281 [25 L. Ed. 845]. The protestant's contention could not be sustained unless these new provisions were treated as meaningless."

The board also referred to the Congressional Record, under date of June 30, 1897 (volume 30, pt. 2, 55th Cong., 1st Sess., p. 2146), from which it clearly appears that the imposition of a duty at 67 cents per ton on "all coals containing less than ninety-two per centum of fixed carbon" was expressly intended by the lawmakers to cover anthracite as well as bituminous coal:

"Mr. Vest: Mr. President, as I understand this proposed amendment, it makes an entire revolution in the taxation upon coal. It puts anthracite coal upon the dutiable list, although a cursory examination of the paragraph would not leave that impression. I have not the amendment before me, but my recollection of it is that there is a duty of sixty-seven cents upon all bituminous coal, and all coal having less than ninety-two per cent. carbon, which would include anthracite coal. Mr. Allison: On coal containing less than ninety-two per cent. of fixed carbon, the duty proposed is sixty-seven cents a ton. Mr. Vest: That puts a duty upon anthracite coal."

From whatever legal standpoint that can possibly be taken, under any authorized rules of construction of the provisions of the Dingley act, the conclusion is irresistible that congress intended that the respective paragraphs should be read just as they are written; and, so read, they are not susceptible of any other construction than that first given in this opinion.

But there is still another point, pressed by appellant with seeming confidence, that demands notice. The court below found that:

"All cargoes of coal whatever, including all cargoes of anthracite coals as they come from the mine, or are loaded or imported in ships or dealt in commercially, contain less than ninety-two per cent. of fixed carbon, although sample lumps for custom house, picked at random from such imported cargoes, have averaged as high as ninety-four per cent. in fixed carbon."

And it is claimed that under such facts it would convict congress of an absurdity to hold that it meant that no anthracite coal should be admitted free, and that such would be the effect if the paragraphs are interpreted according to their plain meaning. The finding relied upon was not upon the material question involved in this proceeding. The controlling question was as to the percentage of fixed carbon which the cargo of coal in question contained. The court found that it was less than 92 per cent. of fixed carbon. Notwithstanding the testimony offered in this particular case, and which was to some extent conflicting, we must presume that congress acted intelligently, with full knowledge of all the facts; for it would be absurd for the court to presume that congress did not know what it was doing when it passed the act in question. If it be true, as appellant claims, that no anthracite coal exceeds the per centum on which the duty is imposed, then the argument here made should be addressed to congress, with the view of securing a change in the law, instead of to the courts. We do not make the law, nor have we any right to amend it; and it is not within our province to question its wisdom, policy, or expediency. These are matters that belong to an entirely separate department of the government. Our duty is accomplished when we judicially determine the interpretation of the language used by the lawmaking power. The judgment of the circuit court is affirmed, with costs.