STONE & DOWNER CO. ET AL. *v.* UNITED STATES (No. 2245).[1]

1. CONSTRUCTION, LEGISLATIVE HISTORY AS AID.

Where the language of a statute is ambiguous or indefinite, the *action* of the legislature upon amendments offered may throw some little light upon the meaning; but the mere offering of an amendment is of *no* value; and the legislative history has no bearing when the language of the statute is plain.

2. CONSTRUCTION OF TARIFF LAWS.

Tariff laws, while subject to the same rules of construction and legal principles for the most part as other legislative acts, yet have, during a century and a half of application, acquired certain characteristics not found in other legislation, and certain definite principles of law have been laid down by the courts in construing tariff laws which of necessity do not apply to other kinds of legislation.

3. CONSTRUCTION, TARIFF LAWS COMMERCIAL.

Tariff laws are framed in the language of men engaged in commerce in order that their meaning may be clear to those who are to operate under them.

4. COMMERCIAL AND COMMON DESIGNATIONS—"COMMONLY KNOWN AS."

Presumptively commercial and common designations coincide; but there are cases where they are different; and, in such cases, the use by Congress of the words "commonly known as" excludes the commercial meaning. Where the words are used with a designation having no other meaning than the commercial one, or having the same meaning commercially and commonly, nothing is added to the designation, and the word "commonly" has the same force as "usually."

5. JUDICIAL LEGISLATION.

Where the language of a law is plain, no rules of construction apply.

6. WOOL, CLOTHING AND COMBING.

Clothing wool is a *short-stapled* wool, usually carded, employed in the manufacture of *woolens*. Combing wool is a *long-stapled* wool, usually combed, employed in the manufacture of *worsteds*. *Both* are used in making clothing.

7. CONSTRUCTION, PARAGRAPH 18, EMERGENCY TARIFF ACT OF 1921—"WOOL, COMMONLY KNOWN AS CLOTHING WOOL"—LANGUAGE OF FORMER ACTS AS AID.

The provision of paragraph 18, emergency tariff act of 1921, for "Wool, commonly known as clothing wool," does not mean all wools used in making clothing, and does not include combing wools. In many former tariff acts the word "usually" has been used in the same connection, and this fortifies the conclusion reached that the word "commonly" is used in that sense, and not in contradistinction to the word "commercially." Consequently the combing wool at bar was not subject to the duty imposed by the paragraph, and the manufactures of combing wool (worsted yarn and cloth) were not subject to the duty imposed by paragraph 19 of the same act upon manufactures of the kind of wool provided for in paragraph 18.

United States Court of Customs Appeals, November 17, 1923.

APPEAL from Board of United States General Appraisers, G. A. 8613 (T. D. 39473).

[Reversed.][2]

*Sharretts, Coe & Hillis* and *Waterhouse & Lockett* (*George J. Puckhafer* and *Allan R. Brown*, associate counsel, and *Edward P. Sharretts* of counsel) for appellants.

*William W. Hoppin*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

---

[1] T. D. 40019.          [2] See denial of rehearing, post.

[Oral argument October 16, 1923, by Mr. Sharretts, and Mr. Waterhouse, and Mr. Lawrence.]

Before MARTIN, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges.

BLAND, Judge, delivered the opinion of the court:

The merchandise covered by this appeal consists of wool, worsted yarn, and worsted cloth. The wool was assessed for duty under paragraph 18 of, the emergency tariff act of 1921, reading "wool, commonly known as clothing wool." Appellants claim that the wool in question is combing wool, and that the yarn and cloth are made from combing wool. The yarns and cloth were assessed for duty under paragraphs 287 and 288 of the act of 1913, and in addition 45 cents per pound under paragraph 19 of the emergency act. It is the contention of the importers that combing wool is not included in paragraph 18, and that their importation falls under the free list of the act of 1913, paragraph 650.

The three paragraphs with which this case is concerned are paragraphs 18 and 19 of the emergency act, and paragraph 650 of the act of 1913, as follows:

The emergency act—

18. Wool, commonly known as clothing wool, including hair of the camel, angora goat, and alpaca, but not such wools as are commonly known as carpet wools: Unwashed, 15 cents per pound; washed, 30 cents per pound; scoured, 45 cents per pound. Unwashed wools shall be considered such as shall have been shorn from the animals without any cleaning; washed wools shall be considered such as have been washed with water only on the animal's back or on the skin; wools washed in any other manner than on the animal's back or on the skin shall be considered as scoured wool. On wool and hair provided for in this paragraph, which is sorted or increased in value by the rejection of any part of the original fleece, the duty shall be twice the duty to which it would otherwise be subject, but not more than 45 cents per pound.

19. Wool and hair of the kind provided for in paragraph 18, when advanced in any manner or by any process of manufacture beyond the washed or scoured condition, and manufactures of which wool or hair of the kind provided for in paragraph 18 is the component material of chief value, 45 cents per pound in addition to the rates of duty imposed thereon by existing law—

and paragraph 650 of the act of 1913, reading as follows:

650. Wool of the sheep, hair of the camel, and other like animals, and all wools and hair on the skin of such animals, and paper twine for binding any of the foregoing. This paragraph shall be effective on and after the first day of December, nineteen hundred and thirteen, until which time the rates of duty now provided by schedule K of the existing law shall remain in full force and effect.

The importers' position is that the words "commonly known as clothing wool" have a well-settled meaning commercially, and with all those who are familiar with the woolen subject, and that "combing wool" is distinct from "clothing wool," and therefore not included in paragraph 18.

The Government contends that "clothing wool" is used here in a broad sense to mean all wool used for making clothing, and that the

words "commonly known as" give them a different meaning from that usually applied commercially to a class of wool.

The record sets out the testimony of numerous witnesses, all of whom have had wide experience in connection with some phase of the woolen question either as purchasers, sellers, appraisers, sorters, importers, exporters, or classifiers. It can be fairly said that there is very little controversy among the witnesses as to the meaning of the terms "clothing wool" and "combing wool." With almost perfect unanimity they have agreed that anyone and everyone knowing anything about wool as an article of commerce knows that clothing wools are the short-fibered wools commonly used by manufacturers in the woolen system of manufacturing, while combing wools are long-fibered wools commonly used by worsted manufacturers in the worsted system. The woolen system of manufacturing embraces the process of carding, while the worsted system of manufacturing embraces the process of combing. While there may be exceptions to the rule, short wools are carded and long wools are combed. The two main classes of wools, therefore, have sometimes been stated as consisting of carding wool and combing wool. But, as a general thing, carding wool and combing wool have been used synonymously. The dictionaries, lexicons, encyclopedias, and writers on the woolen industries, as well as such agencies of the Government as the Tariff Commission and the Agricultural Department, vary but little in their definitions of clothing wool and combing wool, and all, with but few and immaterial exceptions, define clothing wool as a wool of short fiber used in the woolen process, and distinguish it from combing wool, which they define as another class of wool having a long fiber, used in the worsted process, in which process it is combed. The following are some of the definitions taken from various sources:

Sheep are classified on the length of staple into short wools, medium wools, and long wools.

Wool is classed under three general heads: (1) The carding or clothing wools, (2) the combing or worsted wools, and (3) miscellaneous or carpet and blanket wools. (Nelson's Perpetual Loose-leaf Encyc. Vol. XII, Wool, p. 634.)

The length of staple, which is made a basis of general classification, is largely a constitutional or breed characteristic, the staple being from 1 to 2 inches long in the finest Merinos, 8 inches or more in the Lincolns, and reaching 12 and even 15 inches in some combing wools, the length of staple suggesting the grouping of sheep into short wools, middle wools, and long wools. The fine felting wools have a short staple, as a rule, and are used for carding or yarn purposes, while the longer, more lustrous, and less wavy ones are better suited to combing and worsteds. * * * The three main classes of wool on the basis of staple are: (1) Carding or clothing wools, or those of the Merino type, in which felting qualities are desired; (2) combing wools, in which length of staple is required and felting qualities not desired, used for hard-spun, non-felting worsteds; and (3) miscellaneous, sometimes called carpet or blanket wools, long, strong, coarse wools, used for carpets, blankets, and coarse clothing. The clothing wools are commonly classified as picklock * * *, picklock being an

extremely fine fiber. The mass of high-grade clothing is made of the XX and X grades. The combing wools, often called Delaines, were formerly derived from the English mutton breeds, but machinery has been adapted for combing the Merino carding or felting wools, which have been lengthened by breeding and selection. The clothing wool used in the United States, aside from home production, is derived mainly from Australia, South America, and South Africa. The imported combing wool comes mainly from Great Britain, although much comes from New Zealand, Argentina, and Canada. The coarse carpet wools are the product of neglected flocks and unskilled breeding throughout the world. (New International Encyc., Wool, vol. 20, pp. 642–643.)

Wool is divided into pull and clipped or fleece wools, the former being pulled by the roots from the pelt of the dead animal, and the latter clipped from the living one. The clipped wools form the greater part of the wool in market, and these again are divided into long and short staple, or combing and clothing wools. (Appleton's New Practical Cyc., vol. 6, p. 431.)

Wools are divided into two great classes, clothing wools and combing wools, and the fabrics woven from them are termed woolens and worsteds. (Knight's Cyc. of Industry, Woolen and Worsted Manufactures, p. 1795.)

According to the Bradford system of manufacture, wools are classed as "combing" or "clothing." A wool to be combing must be at least 2½ inches in length, while wools shorter than that are used for carding and are termed "clothing."

There is a third class called "carpet wools," which includes the very coarse wools and inferior wools not well adapted to the finer class of goods for which the first two classes are used. Carpet wools are, however, either carded or combed.

The introduction of the French comb has made it possible to comb wools of a shorter length than heretofore, and many of the wools formerly used for carding or clothing are now combed with this comb and are known as "baby combing."

The terms "staple" or "combing" and "clothing" are often added to the grade names to distinguish them. Both the staple or combing and the clothing of a given grade are the same fineness, but the combing wools are generally used for the manufacture of worsteds, while the clothing is used in the manufacture of woolens. (Encyclopedia Americana, Vol. 29, pp. 501, 502.)

Wool when shorn is divided into two classes, short wool or carding wool, seldom exceeding a length of 3 or 4 inches, and long wool or combing wool, varying in length from 4 to 8 inches, each class being subdivided into a variety of sorts according to the fineness and soundness of the staple. (Century Dictionary, 1911, Wool.)

Clothing wool—a fine, close, short-stapled wool. (Webster's New International Dictionary.)

Wool—The three main classes on the basis of staple are (1) carding or clothing wools, or those of the Merino type, in which felting qualities are desired; (2) combing wools, in which length of staple is required; and (3) miscellaneous wools, long, strong, coarse wools used for carpets, blankets, and coarse clothing, and sometimes called "carpet" or "blanket" wools. (Webster's New International Dictionary.)

Combing wool—a wool adapted for being combed. (Webster's New International Dictionary.)

Clothing wool—a compact, fine, short-fibered wool suitable for felting. (Standard Dictionary.)

Clothing wool—a wool usually short and fine in fiber, specially suited in structure of fiber for the woolen trade.—The Wool Year Book, 1923, p. 495. ("Textile Mercury" Annuals.)

The term "clothing" is applied to wools specially adapted for woolen manufacturing, distinguishing them from "combing" wools used in the production of worsted yarns. The properties relate to fineness of fiber, felting, strength and elasticity,

length of staple, softness of handle, and purity of color.—Roberts Beaumont, "Woollen and Worsted," p. 12 (1915).

Worsted is the fiber of wool all laid exactly parallel. Woolen is crossed and uneven like a spider's web. They take all the long hairs and straighten them exactly parallel; and the shorter ones or noils are used for woolen yarns. Only the long fibered can be made into worsted. The fibers of wool to be used in worsted are separated from the short by combing, and the fibers of woolen are crossed by carding. The former are combing wools. The latter are card and clothing wools, which formerly were the only wools used in cloths. (Wool and Manufactures of Wool, Special Report, prepared by the Chief of the Bureau of Statistics, Treasury Dept., 1888, p. XX.)

In 1918 the wool division of the War Industries Board issued the following valuation and classification for wool in connection with their Government purchases:

*Valuations as of July 30, 1917.*

Basis clean scoured.

| | |
|---|---|
| Fine Delaine | $1.85 |
| Fine clothing | $1.75 choice, $1.70 average. |
| Half-blood staple | 1.68 |
| Half-blood clothing | $1.60–$1.62 |
| Three-eighths staple | 1.45 |
| Three-eighths clothing | 1.42 |
| Quarter-blood staple | 1.32 |
| Quarter-blood clothing | 1.30 |
| Low quarter-blood | 1.17 |
| Common and braid | 1.07 |

Quoting from page 215 report of the United States Tariff Commission on the wool growing industry, 1921, we find:

On the basis of length, the division is into "*combing*" and "*clothing*." Combing wool is used in the Bradford (English) system of worsted manufacture, in which nearly all the shorter lengths are combed out as "noil," while the fibers are laid parallel in making the "tops," which is the first stage in the manufacturing process after scouring. Strictly clothing wools are adapted only to carding, by which process the fiber is laid in every direction, interlocked or felted, and are manufactured into "woolen" goods. Noils, which is the by-product of combing and mill waste in general, are used with clothing wools in making some woolens.

The Department of Agriculture of the United States issues various bulletins on the woolen industry, both from the standpoint of the grower and of the manufacturer. Bulletin 206 of the Department of Agriculture, under the title "The Wool Grower and the Wool Trade," on pages 5 and 6, is quoted here as follows:

*Classes of wool.*—The value of wool is influenced more or less by its length and it is classified accordingly. The longer wools are known as "combing" and the shorter ones as "clothing." * * * This classification is founded upon the English or Bradford system of manufacture, which requires a wool to be about 2½ inches long to be successfully combed. The lower grades of combing wools are usually considerably longer than this, as the coarser wool generally has more length. Clothing wools are shorter. Of late years a class midway between the two has sprung up, known as "baby combing." The French combs handle this length of staple quite satisfactorily. The combing wools are used in worsted manufacturing. Only the longer straightened fibers are used and these are placed parallel in the yarn. The short,

broken, and tangled fibers are removed and make up the "noils." Not only is length required, but also strength. Tender wools will not stand the combing process and are unfitted for this purpose, regardless of length. None but virgin wools are used in the manufacture of worsteds.

Clothing wools are used in the manufacture of woolens, felts, etc. The fibers are laid in every direction, and instead of attempting to arrange them parallel as in worsteds, the opposite extreme is desired. Noils, shoddy, etc., can be used in this process of manufacture.

The difference in value between combing and clothing wools is from 2 to 6 cents per scoured pound in favor of the former.

Coarse, low wools, more or less resembling hair, are classed as carpet wools. A very small amount of these are produced in America, most of those used being imported from Asia. Some Navajo wool is used in carpet manufacture.

From the same bulletin, page 18, the following is quoted:

Classification and grades of territory wool—
Combing—
    Fine staple. } usually one grade.
    Fine medium staple. 
    Half-blood staple.
    Three-eighths-blood staple.
    Quarter-blood staple.
    Low quarter-blood staple. } often one grade.
    Coarse, common, low, or braid. 
Clothing—
    Fine clothing. } usually one grade.
    Fine medium clothing. 
    Half-blood clothing.
    Three-eighths-blood clothing.
    Quarter blood clothing, or short quarter-blood.

In "Wool and Wool Manufacture, a Brief Analysis for the Layman," 1920, James Paul Warburg writes:

As we take up the manufacture of worsted and woolen yarns, we shall see how these qualifications play a different part in the two processes. For the present the only difference we are concerned with is staple length. Generally speaking, wools under 2 inches are too short to be combed and are classed as clothing wools. Clothing wools are used for woolens, combing wools for worsteds. In recent years combing machinery has been devised which will comb wools under 1 inch in length so that a considerable quantity of "clothing wools" now go into worsteds (p. 11).

In trying to arrive at the proper construction of the words "commonly known as clothing wool," we are first confronted with the question, To whom did Congress intend that the interpreters of the act should look to find out what kind of wool was commonly known as clothing wool? It seems that there can be no possible dispute that if the words "clothing wool" were used by themselves there could be little contention but what the term would exclude combing wool, for the reason that all authorities and sources of information agree that clothing wool is a short-stapled wool used in woolen manufacture and in the carding process. If the Government has any strength to its position at all, it must be by reliance upon the use of the words "commonly known as."

While the authorities indicate that under improved methods clothing wools are sometimes used in the worsted process, and that combing wools are sometimes used in the woolen process, it is by no means the rule, since even with improved machinery they are not easily changed out of their former class and use without loss. In this connection the following authorities may be pointed out:

Encyclopedia Britannica, Vol. XXVIII, eleventh edition, pages 813–815—

Prior to the invention of a really satisfactory mechanical comb, between 1850 and 1860, the combing operation was the limitation of the worsted trade * * *. The characteristic feature of wool and wool yarns and cloths is the quality of "felting." This quality has always been made use of in woolen cloths, but in worsted cloths, until comparatively recently, it has been largely ignored. To-day, however, cloths are made ranging from the truest woolen to the typical worsted, of which it would be impossible to indicate the type of yarn employed without very careful analysis.

Encyclopedia Britannica, new Vol. XXXII, page 1068—

NOTE.—Large quantities of clothing wool may be employed for combing purposes.

Tariff Commission's Report on Wool Growing Industry, 1921, page 25—

The board (1911) also pointed out that there was no longer any good reason for distinguishing between Class I and Class II wools, because improvements in combing machinery now make it possible to use much shorter staple wools than formerly in the manufacture of worsted. ·

On page 26 is found—

The distinction between Class I and Class II wools seems particularly unnecessary. The amount of wool of Class II now imported is comparatively small. Improvements in machinery are constantly bringing about an interchangeability in the use of different kinds of wool, and the case seems clear for doing away with the distinction. * * * One rate on all wool suitable for making wearing apparel and another rate on what were formerly Class III wools would do much toward this result.

It might be urged that the framers of the emergency law used the words "clothing wool" to embrace classes 1 and 2 in conformity with the apparent recommendation of the Tariff Commission, but it is clear that Congress did not adopt the recommendation of the Tariff Commission, since it did not specifically say "classes 1 and 2," nor did it say, "all wool suitable for making wearing apparel."

The fact that under modern conditions some clothing wool is used in the worsted process, and some combing wool is used in the woolen process, furnishes an additional reason for Congress to have used the words "all wool" or to have included both classes by some appropriate term. Yet there is nothing in the record nor in the history of tariff legislation that tends to show that the interchangeability of use of the two classes of wool has in any way changed the use of the term by those who speak with understanding on the subject. The emergency act does not attempt to consolidate the two classes of wool under a new term, but emphasizes the ordinary use of the name

which is now used, and for generations has been used, to describe one class.

In the briefs and in the argument before this court great stress was placed upon the fact that the Congressional Record of February 1, 1921, at page 2498, shows that Senator Lodge introduced the following amendment:

Paragraph 18, page 3, line 16, strike out the words "wool, commonly known as clothing wool," and in place thereof insert the words " all wools."

As far as we have been able to observe, the courts have never given the introduction of an amendment by a legislator the force of evidence tending to prove legislative intent, but have regarded the action of either branch of the legislature on such an amendment as having probative effect.—Koch *v.* United States (6 Ct. Cust. Appls. 534–8–9; T. D. 36148), Willenborg & Co. *v.* United States (6 Ct. Cust. Appls. 451; T. D. 35985), and Dunlap *v.* United States (173 U. S. 65, 75). While this kind of evidence may be considered as throwing some light upon the question of legislative intent, we are inclined to regard it of doubtful, or at least, uncertain value. We are not privileged to know what motives prompted the acceptance, rejection, or failure of consideration of proposals made by individual members. To rely upon the act of one individual member in proposing legislation, or to give much weight to the failure of the body to consider the proposal, in determining the intent of the completed legislative enactment, would be very unsatisfactory procedure in construing its meaning. It is urged by the appellant that Senator Lodge, by his proffered amendment, recognized that the words "commonly known as clothing wool" did not embrace *combing wool,* and directed the attention of the Senate to the omission; and it is urged by the Government that the failure of the Senate to discuss or consider the amendment was evidence that the Senate believed the words "wool, commonly known as clothing wool" embraced all wool, and that the amendment was unnecessary. However, this court in Koch, supra, in construing paragraph 166 of the act of 1913, took special notice of a somewhat similar case, in which an amendment introduced by Senator Smoot was referred to, but in that instance the amendment of the Senator was rejected by affirmative action of the Senate.

In the case of Dunlap *v.* United States, supra, we find the following:

Without questioning the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of a statute passed by that body (United States *v.* Trans-Missouri Freight Association, 166 U. S. 290, 318), it is nevertheless interesting to note that efforts were made in the Senate to amend the bill by the addition of sections which, while making alcohol used in the arts free from the tax, sought to secure the Government from fraud by provisions for the methylating of such spirits, so as to render them unfit for use as a beverage; that these proposed amendments were rejected (26 Cong. Rec. 6935, 6936); and that subsequently section 61 was adopted as an amendment, it being urged in its support

that "if the Secretary of the Treasury and the Commissioner of Internal Revenue think they can not adopt any regulations which will prevent fraud, then nothing will be done * * *."

It will be noted that there was affirmative action upon the amendments and that the court in rendering its decision did not rely upon the debates in Congress or upon the thought of one individual in introducing an amendment.

At any rate we can not see how the introduction of the amendment of Senator Lodge and the subsequent failure of the Senate to act upon the same can give us any light upon the intention of Congress in its use of the terms under consideration.

If the terms used by Congress in the case at bar were ambiguous or indefinite, we might look further into the extrinsic circumstances incident to the passage of the act. Since the terms used are unambiguous, it is not proper to permit such evidence to impeach, destroy, or change the ordinary meaning of the language used, for such procedure would result in subjecting all laws to the hazard of a most uncertain and unreliable rule of interpretation. In the light of this position it is unimportant for us to consider the statements of the chairman and members of the Committee on Ways and Means, the report of the committee, and other evidence of this character.

Tariff laws, while subject to the same rules of construction and legal principles for the most part as other legislative acts, yet have during a century and a half of application acquired certain characteristics not found in other legislation, and certain definite principles of law have been laid down by the courts in construing tariff laws which of necessity do not apply to other kinds of legislation. We think it is well settled that tariff laws generally are framed in the language of men engaged in commerce, and are so framed that they may be understood by them, and that tariff laws are directed to the understanding of the class of citizens who are to operate under them, or who are to be affected by their provisions.—United States v. Davies (11 Ct. Cust. Appls. 392; T. D. 39317); Hedden v. Richards (149 U. S. 346, 349).

In the Davies case, supra, the court said:

Congress is presumed to know the nomenclature and language of commerce. · Tariff laws apply especially to men engaged in commerce and are drafted in the words and terms and vocabulary which are in use and understood by the trade. Tariff designations must be held, therefore, to have the sense and meaning assigned to them by trade and commerce, and a distinction once made by Congress as to tariff commodities will be presumed to continue in the absence of anything showing a contrary legislative intention.

In the Hedden case, supra, the court said:

In such case, as in the other case, the words are to be taken in the sense in which they will be naturally understood by those to whom they are addressed (p. 350).

In the case of Elliott *v.* Swartwout (35 U. S. (10 Pet.) 137), in holding that "worsted" was not woolen goods under the act of 1832, the court said:

Laws imposing duties on importations of goods are intended for practical use and application by men engaged in commerce; and hence it has become a settled rule in the interpretation of statutes of this description to construe the language adopted by the legislature, and particularly in the denomination of articles, according to the commercial understanding of the terms used. This rule is fully recognized and established by this court, in the case of Two Hundred Chests of Tea, reported in 9 Wheat. 438. The court there say, the object of the duty laws is to raise revenue, and for this purpose, to class substances according to the general usage and known denominations of trade. Whether a particular article was designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance was of no importance in the view of the legislature. It applied its attention to the description of articles as they derived their appellations in our own markets, in our domestic as well as our foreign traffic; and it would have been as dangerous as useless to attempt any other classification than that derived from the actual business of human life. It being admitted in this instance that worsted is a distinct article, well known in commerce under that denomination, we must understand Congress as using the term in that commercial sense and as contradistinguished from wool, and woolen goods, and other well-known denominations of goods (p. 150).

This rule seems not only to be well settled, but to be well grounded in principle. To whom should Congress address its tariff acts? To the populace on the street, who have nothing to do with the subject matter of the legislation? Or, should they be directed to those from whom the Congress expects obedience, and to its officers upon whom its administrative duties fall?

In the question at bar whom will we consult as to the meaning of the term "commonly known as clothing wool"? It has been suggested here that the inquirer should go out into the street and at random ask any English-speaking individual the meaning of the phrase "commonly known as clothing wool." It is urged that this would elicit the answer, "Wool from which clothing is made." It probably would elicit the answer, "I know nothing about the woolen business." But, if perchance, one familiar with growing, selling, importing, exporting, buying, grading, sorting, manufacturing, or handling wool in any way was asked the question, in our judgment he would say, "'Wool, commonly known as clothing wool,' is a wool of short fiber used in the woolen process, and is usually a carding wool." And if he were asked, "What is 'combing wool'?" he would reply that "it was distinguished from clothing wool chiefly on account of its long staple, which permitted it for the most part to be combed." Should interpreters of the act, in seeking to properly classify a product, and in order to find out the definition of the words used, seek those who know nothing about the different classes of the article? Surely this would be to impute to Congress an absurd intention. Who is it that "commonly" knows clothing wool? The Government's position implies that there is a great class of citizens who are

not engaged in the wool trade in any way, and who are not students of the wool question, and who have never consulted the dictionaries, encyclopedias, etc., but who have knowledge on the subject of clothing wool which we need in determining the intent of Congress.   The class of people the Government has in mind may know what wool is, but probably have never heard of "clothing wool."   Would it not be absurd to declare that Congress intended that the interpreters of the act, in trying to determine its meaning, should go to those who had never heard of the term rather than to those to whom the act was directed, or to those familiar with the use of the term wherever and whenever it is used?   We can, therefore, see no additional meaning given to the words "clothing wool" by the use of the words "commonly known as," and in arriving at the conclusion we have considered the fact that it has not been shown in this case that there is any difference or any distinction between what is "commercially" known and what is "commonly" known.   Indeed, we can see no difference in the meaning or application of the phrases "commonly known" and "usually known."

Paragraph 362 of the act of 1909 is as follows:

362. Class two, that is to say, Leicester, Cotswold, Lincolnshire, Down combing wools, Canada long wools, or other like combing wools of English blood, and usually known by the terms herein used, and also hair of the camel, Angora goat, alpaca, and other like animals.

The corresponding provisions in the acts of 1897, 1890, 1883, and 1867, contained the same phrase, and as far as we know no court or administrative official has held that the phrase "usually known" changed the meaning from that understood by those familiar with the terms used in woolen commerce and trade.

There are cases where the imported article may have a definite commercial designation and yet be commonly known by another name.   If in that instance Congress uses the words "commonly known as" in describing the article by a name other than the commercial term, then in construing its meaning, the courts universally hold Congress to have excluded the commercial designation.— Cadwalader v. Zeh (151 U. S. 171); Roosevelt v. Maxwell (20 Fed. Cas. 1155).   But this is not a case where the commercial designation is relied upon by the importer; a commercial designation is not before us.   But even if it were, there seems to be but one understanding as to the meaning of "clothing wool."   In the case of Tiffany v. United States (131 Fed. 398), certain silver handbags or purses were held excluded from paragraph 434, act of 1897, which provided that "articles commonly known as jewelry," etc.   Upon the testimony of commercial witnesses, the court said:

The uncontradicted testimony of witnesses from various branches of trade, including dealers in jewelry, fancy goods, silverware, and of salesmen in department stores,

shows that these articles are not commonly known as jewelry, and are not manufactured in jewelry factories, or sold as articles of jewelry.

It seems that this case stands on all fours with the case at bar. There the commercial definition of jewelry as taken from those familiar with the business was held to be the same as was "commonly known."

In Swan *v.* Arthur (103 U. S. 597), the court said:

While tariff acts are generally to be construed according to the commercial understanding of the terms employed, language will be presumed to have the same meaning in commerce that it has in ordinary use, unless the contrary is shown.

There is certainly no showing in this case that the term "clothing wool" has a common or ordinary use different from its use among commercial men.

It is urged with much force by the Government that Congress intended *in the emergency* to levy duty on all wools except carpet wools, and that this court should declare the combing wool in controversy in this case clothing wool within the *broad* meaning of the act. It is urged that the court is privileged to take into consideration the conditions of commerce and trade on the date of the passage of the statute, the necessity for a protective tariff to be levied on combing wool which was seeking admission into our home market already filled with the home-produced product; that the report of the Tariff Commission before the framers of the law, the statements of members while in committee, and the debates of members of Congress while on the floor should be permitted to override the plain wording of the act in determining the legislative intent. The reasons and arguments set out by the Government in their very forceful brief and oral argument are quite impressive in that direction. After thoroughly considering the history of the legislation, the commercial and trade conditions at the time of its enactment, and the committee's report on the bill, as well as other related documents, we are impressed with the fact that Congress *may* have thought that there was a necessity for levying a duty upon combing wool, and even, we dare to say, some Members of Congress may have felt that section 18 included combing wool. Some of them no doubt did not think that the terms used included combing wool. Some Members may have supported the legislation believing it covered all wool not expressly exempted, while others no doubt supported it because, according to their interpretation of the term, it did not include certain wools. To hold that Congress in its completed enactment, by the use of the words "commonly known as clothing wool" meant to include "combing wool" is to do violence to every rule and canon of construction known to tariff jurisprudence. The courts in construing tariff laws have almost uniformly held that it is the judicial function to construe the language as found in the statute, giving

the words used their ordinary meaning, and where the language is plain, that the legislative intent can not be declared to be other than what the ordinary meaning of those words will import in the absence of evidence establishing a commercial meaning different from the ordinary meaning.—Ringk & Co. *v.* United States (10 Ct. Cust. Appls. 107; T. D. 38372); Merck *v.* United States (151 Fed. 14). In the latter case, the court said:

> The courts can only ascertain the legislative intention by the language used, and it is not their duty by a distorted construction to attempt to cover an article which may have been omitted even by inadvertence (p. 15).

No matter how great the emergency may be for a different construction, or what this court may think of the wisdom of Congress in failing to say "all wool," or to say "clothing wool and combing wool," or "Classes I and II," it would be a far-reaching and dangerous precedent to hold that the author of the bill did not know what he was saying when he introduced the bill, and that the committee did not know what they were reporting when they reported the bill, and that Congress did not know what it was making dutiable when it was enacting the legislation, and that the Executive did not know the meaning of the words in the act when he approved it.

In United States *v.* Marsching (1 Ct. Cust. Appls. 216; T. D. 31257), the court said:

> While it is true that every provision of law must be read in the light of all the other provisions of that law, and while it is true that the meaning of Congress, particularly in tariff legislation, must be ascertained in the light of conditions of commerce, and that in this light the language used by Congress must be interpreted, or even in some cases supplied, we do not think that in a case like this where the essential words supporting the construction contended for have been expressly omitted by Congress the courts can by any rule or method of construction read back into the act such words. * * * The fact that some inconsistency may be wrought by this holding, or that some inequalities of duties may be levied, or that some disturbance may be had in the remaining or other provisions, is not a sufficient warrant for the court to read back into the statute language expressly omitted therefrom by Congress. In the opinion of the court the language of the act is plain and unambiguous. The rule is well settled that in the presence of such a provision the court should abstain from interfering with the will of Congress as expressed.

The Supreme Court of the United States in Bate Refrigerating Co. *v.* Sulzberger (157 U. S. 1, at p. 37) said, restating an earlier opinion set out in Scott *v.* Reid (35 U. S. (10 Pet.) 524):

> Where the language of the act is explicit, there is great danger in departing from the words used, to give an effect to the law which may be supposed to have been designed by the legislature. * * * It is not for the court to say, where the language of the statute is clear, that it shall be so construed as to embrace cases, because no good reason can be assigned why they were excluded from its provisions.

In United States *v.* Fisher (6 U. S. (2 Cr.) 358, 385), Chief Justice Marshall said that where the meaning of the legislature was plain "it must be obeyed."

In United States *v.* Shing Shun & Co. (173 Fed. 844), the court said:

Where the language employed in an act is clear and certain, they [the court] have nothing to do with the reasonableness or justice of the results flowing from according it its natural, usual, and obvious meaning, nor with any supposed policy actuating its framers (p. 847).

The rule is very definitely laid down in Coles *v.* Collector (100 Fed. 442) as follows:

To undertake a departure from the language used would in fact be an unjustifiable assumption by the court of legislative power. It is the duty of the court, where the language is free from doubt or uncertainty, to confine itself to the words of the legislative body that enacted the law, without adding thereto or subtracting anything therefrom.

Now, in the case at bar, having in mind all the evidence and all the definitions in all the books, authorities, and reports, and having before us the use of the terms by Congress in past legislation, is the meaning of the words "clothing wool," or of the phrase "commonly known as clothing wool" free from doubt or uncertainty? Is the definition well settled and free from ambiguity? If these questions are answered in the affirmative, this court has but one duty, and that is to "confine itself to the words of the legislative body."

Since the earliest days of the Republic's legislative life it has been confronted with the problem of levying duty upon wool. Congress has used many different words and phrases with many different meanings in its legislation on that question, and the past acts of Congress show that it possessed scientific and accurate knowledge on the subject. Its woolen schedules have been prepared in the language of, and for the understanding of, those who had acquired special knowledge of the subject matter. Can this court properly hold that in the preparation and passage of the emergency act it departed from all of its previous understanding of the definitions and application of terms, and intended that a different rule of interpretation should be applied to this special piece of legislation? It might be well for a fuller understanding of the legislative history to set out extracts from the various tariff acts of the past:

*May 19, 1828.*—First. On wool unmanufactured, four cents a pound; * * *

*July 14, 1832.*—First. Wool, unmanufactured * * *

*March 16, 1855.*—* * * pelts; wool; * * * free of duty * * *

*March 3, 1857.*—* * * sheep's wool, unmanufactured, of the value of twenty cents per pound * * * and hair of the alpaca, the goat, and other like animals * * *

*March 2, 1861.*—Sec. 12. First. On all wool unmanufactured, and all hair of the alpaca, goat, and other like animals, unmanufactured * * * *Provided*, That any wool of the sheep, or hair of the alpaca, the goat, and other like animals * * *

Sec. 23. Wool, unmanufactured, and all hair of the goat, alpaca, and other like animals, unmanufactured * * *

*June 30, 1864.*—Sec. 4. On all wool, unmanufactured, and all hair of the alpaca, goat, and other like animals, unmanufactured * * * That any wool of the sheep, or hair of the alpaca, the goat, and other like animals * * *

*July 28, 1866.*—* * * in determining the dutiable value of merchandise * * * provided further that nothing herein contained shall apply to long-combing or carpet wools * * *

*March 2, 1867.*—* * * there shall be levied, collected, and paid on all unmanu- actured wool, hair of the alpaca, goat, and other like animals * * * All wools, hair of the alpaca, goat, and other like animals, as aforesaid, shall be divided, for the purpose of fixing the duties to be charged thereon, into three classes, to wit:

Class 1. Clothing wool. That is to say, merino, mestiza, metz, or metis wools or other wools of merino blood, immediate or remote; down clothing wools, and wools of like character with any of the preceding, including such as have been heretofore usually imported into the United States from * * *, and also including all wools not hereinafter described or designated in classes two and three.

Class 2. Combing wool. That is to say, Leicester, Cotswold, Lincolnshire, Down combing wools, or other like combing wools of English blood, and usually known by the terms herein used; and also all hair of the alpaca, goat, and other like animals.

Class 3. Carpet wools, and other similar wools. Such as Donskoi, native South American, Cordova, Valparaiso, native Smyrna, and including all such wools of like character as have been heretofore usually imported into the United States from Turkey, Greece, Egypt, Syria, and elsewhere.

*June 6, 1872.*—Sec. 2. On all wools, hair of the alpaca, goat, and other like animals and all manufactures wholly or in part of wool or hair of the alpaca and other like animals, except as hereinafter provided (90 per cent of duty of 1867, the tax imposed being 90 per cent of the then existing duty).

*March 3, 1883.*—Schedule K.—Wool and woolens. All wools, hair of the alpaca, and other like animals, shall be divided, for the purpose of fixing the duties to be charged thereon into the three following classes:

Class one, clothing wools. That is to say, * * * (Same as in 1867).

Class two. Combing wools. That is to say, Leicester, Cotswold, Lincolnshire, Down combing wools, Canada long wools, or other like combing wools of English blood, and usually known by the terms herein used, and also all hair of the alpaca, goat, and other like animals.

Class three. Carpet wools, and other similar wools. (Same as in 1867.)

*October 1, 1890.*—All wools, hair of the camel, goat, alpaca, and other like animals shall be divided for the purpose of fixing the duties to be charged thereon into the three following classes:

Class one. That is to say * * * (Same as in 1883.)

Class two. That is to say * * * (Same as in 1883.)

Class three. That is to say, Donskoi, native South American, Cordova, Valparaiso, native Smyrna, Russian camel's hair, and including all such wools of like character as have been heretofore usually imported into the United States from Turkey, Greece, Egypt, Syria, and elsewhere, excepting improved wools hereinafter provided for.

*August 27, 1894.*—Free list. Par. 685. All wool of the sheep, hair of the camel, goat, alpaca, and other like animals, and all wool and hair on the skin, noils, yarn waste, card waste, bur waste, slubbing waste, roving waste, ring waste, and all waste, or rags composed wholly or in part of wool, all the foregoing not otherwise provided for.

*July 24, 1897.*—All wools, hair of the camel, goat, alpaca, and other like animals shall be divided, for the purpose of fixing the duties to be charged thereon, into the three following classes:

Class one, that is to say, merino, mestiza, metz, or metis wools, or other wools of Merino blood, immediate or remote, Down clothing wools, and wools of like character with any of the preceding, including Bagdad wool, China lamb's wool, Castel Branco,

Adrianople skin wool or butcher's wool, and such as have been heretofore usually imported into the United States * * * and all wools not hereinafter included in classes two and three.

Class two, that is to say, Leicester, Cotswold, Lincolnshire, Down clothing wools, Canada long wools, or other like combing wools of English blood, and usually known by the terms herein used, and also hair of the camel, Angora goat, alpaca, and other like animals.

Class three, that is to say, Donskoi, native South American, Cordova, Valparaiso, native Smyrna, Russian camel's hair, and all such wools of like character as have been heretofore usually imported into the United States from Turkey, Greece, Syria, and elsewhere, excepting improved wools hereinafter provided for.

*August 5, 1909.* 360. All wools, hair of the camel, goat, alpaca, and other like animals, shall be divided, for the purpose of fixing the duties to be charged thereon into the three following classes:

361. Class one, that is to say, merino * * * (Same as in 1897.)

362. Class two, that is to say, Leicester * * * (Same as in 1897.)

363. Class three, that is to say, Donskoi * * * (Same as in 1897.)

*October 3, 1913.*—Free list. Par. 650. Wool of the sheep, hair of the camel, and other like animals, and all wools and hair on the skin of such animals, and paper twine for binding any of the foregoing. This paragraph shall be effective on and after the first day of December, nineteen hundred and thirteen, until which time the rates of duty now provided by Schedule K of the existing law shall remain in full force and effect.

Nowhere in the century and a quarter gone will you find in its written word, in woolen tariff legislation, anything to indicate that Congress did not fully understand the meaning of its words, or that it did not apply and carefully select them with a view to informing those to whom the law was directed exactly what kind of merchandise they were to deal with. We are not unmindful of the rules invoked by the Government that the intent of the law is the law, and that courts must not impute to the legislature the doing of a ridiculous, vain, or absurd thing. If the words used were susceptible of more than one reasonable construction we would have a different question. For this court to hold that the phrase "commonly known as clothing wool" embraces and includes "combing wool" would be for this court to legislate, and thereby usurp the functions of Congress. From many viewpoints this might be desirable in this case, but it would be embarking upon a very dangerous and uncertain course, which precedent, if followed, would lead to disastrous consequences. The rule laid down in Elliott *v*. Swartwout, supra, in our judgment should be followed, and a strict adherence to this principle, which, for the most part, has been adhered to in the past, will be conducive to the best understanding of and fullest compliance with the purposes of legislation.

If we expect proper respect for laws and a compliance with their provisions; if we hope for a proper understanding in the administration of them, the meaning justified by the words used must not be overthrown by extrinsic circumstances. We hold that when Congress used the phrase "commonly known as clothing wool," it knew that

there was a definite kind of wool known to its citizens who were familiar with the question as "clothing wool," and that it must be declared to have intended the ordinary and usual meaning of its words. Clothing wool does not embrace combing wool. Combing wool, and products made therefrom, are the goods in controversy. Combing wool, on date of the entry, was on the free list of the act of 1913. The protests should have been sustained. The judgment of the Board of General Appraisers is *reversed*.

---

[Rehearing denied February 9, 1924.]

BLAND, Judge: Replying to the Government's brief, on petition for rehearing, importers have conceded, as the Government claims, that Exhibit 13 was not combing wool but was clothing wool. The opinion of this court in this case, we think, is sufficiently clear to indicate how Exhibit 13 should be classified, but to obviate any doubt on the question as to how it should be classified, we find that Exhibit 13 was in fact clothing wool.

Accordingly the judgment heretofore entered by the court is modified so as to affirm the judgment of the Board of General Appraisers with respect to the merchandise represented by Exhibit 13. In all other particulars our former judgment is reaffirmed, and the petition for a rehearing is denied.